# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CHOUDHURY SALEKIN,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀No. 3:21-cv-00107
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
DENIS MCDONOUGH, Secretary⠀⠀)
Department of Veterans Affairs,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)

## MEMORANDUM OPINION

In his Complaint, Choudhury Salekin alleges that, while working for the Veterans Administration, he was subjected to "National Origin/Race Discrimination" (Count I); "Retaliation/Retaliatory Harassment" (Count II); and "Harassment/ Hostile Work Environment" (Count III) (Doc. No. 1). Now before the Court is Defendant's fully-briefed Motion for Summary Judgment. (Doc. Nos. 65, 81, 84). For the reasons that follow, the Motion will be granted in its entirety.[1]

## I. Factual Background and Standard of Review

In moving for summary judgment and in accordance with this Court's Local Rules, Defendant has filed a "Statement of Material Facts" ("DSOF") (Doc. No. 71) consisting of 140 paragraphs that, for the most part, Plaintiff admits to being true. Also in accordance with the Local Rules, Plaintiff has filed an "Additional Statement of Facts" ("PSOF") (Doc. No. 80) consisting of 63 paragraphs, the majority which are denied by Defendant because the "alleged fact relies solely

---

[1] Defendant has also filed a Motion to Strike (Doc. No. 82). This Motion will be denied as moot because, even considering the evidence to which Defendant objects, Plaintiff cannot overcome Defendant's Motion for Summary Judgment.

on a self-serving declaration," or the "alleged fact relies solely on speculation contained in a self-serving declaration," or similar iterations thereof. (Doc. No. 83, *passim*).

For example, Defendant disputes the following "fact" because it "relies solely on speculation contained in a self-serving declaration":

> 7. In July or August 2013, Dr. Cooper called Dr. Salekin to his office in Nashville and requested that he terminate an African American, female employee whose name was Monica Martin. Ms. Martin worked for Dr. Salekin for 20 or more years and did a good job in the Sleep Department. Dr. Salekin told Dr. Cooper she was a good employee, and that he did not want to fire her. In spite of his opposition to terminating Ms. Martin from employment, Dr. Cooper insisted that Dr. Salekin fire her.

(Id. at 3). This paragraph is not based upon speculation – either those things did or did not occur, and either Plaintiff thought Ms. Martin was a good employee and did not want to fire her, or he did not. To the extent there is a dispute about whether Plaintiff and Dr. Cooper met regarding Ms. Martin and whether she actually "did a good job" those are questions of fact. As for being self-serving, there would be little point in filing an affidavit or declaration if it was not self-serving, at least to an extent.

At this point, the Court finds it appropriate to set forth the law surrounding summary judgment. That law, in the form of Rule 56 of the Federal Rules of Civil Procedure, not only provides the framework for the legal analysis, it establishes why Plaintiff has not shown a triable issued on any of his claims.

The standards governing summary judgment have been restated in various formulations on countless occasions. Recently, this Court summarized them as follows:

> Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Scott v. First S. Nat'l Bank, 936 F.3d 509, 516 (6th Cir. 2019). A dispute

is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). If the movant's initial burden is met, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Such parties "must support the[ir] assertion[s] by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations." Blankenship v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., No. 3:19-CV-00146, 2021 WL 3037485, at *2 (M.D. Tenn. July 19, 2021) (citing Fed. R. Civ. P. 56(c)(1)(A)).

When evaluating the record, the Court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs., 974 F.3d 652, 660 (6th Cir. 2020). "In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party." Williams v. Tyco Elec. Corp., 161 F. App'x 526, 531 (6th Cir. 2006) (citing Anderson, 477 U.S. at 255). Consideration of summary judgment is purely an objective exercise, as the Court is not to make credibility determinations, weigh the evidence, or determine the truth of the matter. Anderson 477 U.S. at 242, 255.

Campbell v. DePuy Orthopaedics, Inc., No. 3:23-CV-00029, 2023 WL 2228978, at *2 (M.D. Tenn. Feb. 24, 2023).

Tellingly, self-serving affidavits are not impermissible. True, an affidavit cannot be conclusory, Ctr. For Biological Diversity v. Lueckel, 417 F.3d 532, 540 (6th Cir. 2005), but "nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving," United States v. Stein, 881 F.3d 853, 856–57 (11th Cir. 2018). "After all, most affidavits submitted [in response to a motion for summary judgment] are self-serving," and only become problematic when "they are not based on personal knowledge[.]" Payne v. Pauley, 337 F.3d

767, 772 (7th Cir. 2003). Self-serving affidavits are also problematic when a party attempts to "create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." Penny v. United Parcel Service, 128 F.3d 408, 415 (6th Cir. 1997); accord Reid v. Sears, Roebuck & Co., 790 F.2d 453, 460 (6th Cir.1986) (establishing this general principle) . These rules, however do not "prevent[] a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 907 (6th Cir. 2006).

With this understanding of the parameters of the inquiry, the Court sets forth the basic factual allegations needed to place the parties' arguments in context. In doing so, and because a chronological recitation of the facts would more likely confuse than enlighten, the Court structures the facts by generally utilizing the sub-headings in Defendant's Statement of Fact.

## A. **Plaintiff's Employment History**

Plaintiff, a neurologist, is originally from Bangladesh. He began working for the Veterans Administration ("VA") in 1993 where he remained for the next 24 years. His employment was terminated on November 18, 2017. (DSOF ¶ 1).

From 1996-2004, Plaintiff was Director of Sleep Medicine at the Alvin C. York VA hospital in Murfreesboro, Tennessee. From 2012 until his termination, he held that same position for the Tennessee Valley Healthcare System ("TVHS"), that includes the VA hospitals in both Murfreesboro and Nashville, Tennessee. His first-line supervisor was Dr. Michael Cooper, Chief of Neurology, and his second-line supervisor was Chief of Staff Dr. Roger Jones who was then replaced by Dr. John Nadeau. Jennifer Vedral-Baron was the Health Systems Director of the TVHS. (Id. ¶¶ 2-6).

4

B. **Compensation Panels and Pay**

Compensation panels for physicians and dentists at the VA are supposed to be convened every two years in an effort to provide competitive pay. On April 29, 2015. such a panel met and set Plaintiff's base pay at $131,957 and his market pay at $82,610 for a total of $214,567. (Id. ¶¶ 19, 20). The going rate at that time for similar providers in the local market was between $110,000 and $230,000. (Id. ¶ 21). On August 18, 2017, a panel set Plaintiff's base pay at $139,356 and his market pay at $86,800 for the total compensation of $226,156. (Id. ¶¶ 29, 30). At that time, the pay range in the local market was between $101,967 and $264,000. (Id. ¶ 31).

Plaintiff's salary was based upon the VA Table for neurologist, and he received nothing for being a Sleep Specialist because that is not a separate clinical specialty for VA physicians. Plaintiff recognizes that extra-pay for Sleep Specialists was not provided for in the tables, but he believes he should have been paid more because he was a specialist. He concedes, however, that he was the second highest paid physician in his service. (Id. ¶¶ 34-37).

In addition to his regular pay, Plaintiff was also awarded performance pay. For the period from October 1, 2012 to September 30, 2013, Plaintiff received performance pay of $3,000. For the period from October 1, 2014 to September 30, 2015, he received $9,675. (Id. ¶¶ 16, 17). For the period from October 1, 2015, to September 30, 2016, however, Plaintiff received no performance pay. (Id. ¶ 22). Plaintiff insists that his performance pay during this entire period should have been approximately $12,000 annually "based on his level of skill and proficiency at the VA," and argues he was paid "at a much lower scale than what a Sleep Medicine Specialist would receive at the VA." (PSOF ¶¶ 10, 11, 19). He supplies no evidence to support these contentions other than his own say-so. He also concedes that the Health Systems Director "is the sole authorizing official on all

5

performance pay decisions."  (Id. ¶ 24).

**C.  Performance and Misconduct**

The VA monitors its physician through what is called the Ongoing Professional Practice Evaluation ("OPPE").  The monitoring allows the facility to identify and correct problems relating to patient care quality.  (DSOF ¶¶ 39-40).  Each provider in the neurology service (of which Plaintiff was a part) received an OPPE every six months.  (Id. ¶ 65).

When questions arise about a physician's ability to provide safe, high-quality patient care, it triggers oversight in the form of a Focused Professional Practice Evaluation ("FPPE").  (Id. ¶¶ 39, 52, 56, 60, 61).  This oversight may include periodic chart review, direct observation, monitoring of diagnostic and treatment techniques, or discussion with other individuals involved in the care of the patients. (Id. ¶ 58).  Additionally, where a concern or issue has been identified, a physician may be subjected to a Focused Clinical Care Review ("FCCR"), which is a retrospective review of a provider's actions. (Id. ¶ 114, 115).

On November 26, 2014, December 15, 2015, and December 7, 2016, Plaintiff was rated as minimally satisfactory in his annual performance appraisals.  Plaintiff disagreed with those appraisals and refused to sign them.  (Id. ¶¶ 63, 64, 88).

VA physicians are required to complete annual training, including training on HIPAA-privacy, ethics, and IT security.  TVHS's local policy was that those who do not complete the training lose their computer privileges.  (Id. ¶¶ 68, 69).

Plaintiff failed his May 1 to September 30, 2015 OPPE because he (1) did not complete required annual training; (2) did not comply with privacy policies (evidenced by his leaving papers with private patient information in clinic rooms); and (3) was repeatedly late for Friday morning

6

clinics. (Id. ¶¶ 70, 71). Although Plaintiff admits that he failed the OPPE, he contends that the process was flawed and that Dr. Cooper essentially had it out for him. Again, this is based solely on his say-so. He also argues he was not "habitually late" on Fridays and, when he was, there were legitimate reasons (as discussed further below) for his being tardy.

On September 25, 2015, a head nurse found disability examination paperwork completed by Plaintiff for a non-VA patient in one of the clinic examination rooms and she provided those to Dr. Cooper. Sometime shortly thereafter, Plaintiff engaged in disruptive behavior by yelling at that same nurse regarding patient scheduling. (Id. ¶¶ 74, 75). Plaintiff was relived of his supervisory duties on October 23, 2015. (Id. ¶ 77).

On July 11, 2016, Plaintiff received notice of allegations of misconduct, including:

• Using VA facilities to see patients not on schedule, possibly in support of non-VA sanctioned external activities;

• Using substantial VA equipment and time in support of non-VA sanctioned external activities;

• Receiving non-VA packages and materials at the VA in support of non-VA sanctioned external activities;

• Making outside referrals for patients;

• Engaging in outside activities in direct and substantial conflict with official VA activities; and

• Using public office for private gain.

(Id. ¶ 78). Plaintiff denies the bulk of these allegation (as also discussed further below). Shortly thereafter, on July 21, 2016, Plaintiff was notified that his workspace was off-limits, and he was escorted to his office to retrieve his personal items. (Id. ¶¶ 79).

On December 12, 2016, Plaintiff was questioned by an agent of the Office of Inspector

7

General ("OIG"). During the interview, Plaintiff denied referring VA patients to outside attorneys. Defendant claims this was untruthful because Plaintiff not only received payments for his referrals, but also participated in depositions during VA work hours. (Id. ¶¶ 89-91).

On March 23, 2017, an Administrative Fact Finding (AFF) board was empaneled to determine whether: (1) Plaintiff had made inappropriate and disrespectful comments to Veterans; (2) Plaintiff's patients were asking to change doctors; and (3) Plaintiff's charts were appropriately documented. The same day, Plaintiff was notified that his privileges would be summarily suspended pending the outcome of the investigation. During this suspension, Plaintiff was not banned from the VA hospital, but he was not allowed to see patients. (Id. ¶¶ 95, 98, 100).

Around this same time, Plaintiff was also referred to the Office of Special Counsel for a separate investigation into whether he violated the Hatch Act. That Act generally prohibits federal employees from: being candidates in partisan elections; soliciting or receiving political contributions; using their influence to affect an election; and engaging in any political activity while on duty. (Id. ¶ 102).

On April 13, 2017, the AFF determined that some patients (including "Patient B") felt disrespected by Plaintiff. The next day, during his OPPE, Plaintiff was informed that several events triggered the need for an FPPE, including Plaintiff neglecting alerts and medication refill request, and failing to secure messages. Plaintiff was also informed that several patients had requested reassignment based on his unprofessional remarks. (Id. ¶¶ 103, 105, 106). Consequently, Plaintiff's summary suspension was continued for another 30 days. (Id. ¶ 108).

On June 23, 2017, Plaintiff was informed that he was being reprimanded for allegedly inappropriate conduct because he repeatedly asked a nurse practitioner if she had a boyfriend. This

8

was allegedly followed by Plaintiff contacting the nurse practitioner via a patient's record and directing inappropriate language towards her. (Id. ¶¶ 111, 112). Plaintiff admits being reprimanded, but denies the conduct. (Id.).

In August 2017, two neurologist reviewed 20 of plaintiff's clinical charts as a part of an FCCR. Of those, the neurologists found that 17 showed Plaintiff was not meeting the standard of care. (Id. ¶¶ 118). Again, Plaintiff admits that these facts occurred, but denies that he failed to meet the standard of care and claims his charts were reviewed more harshly than they should have been because of Dr. Cooper. (Id.).

On October 13, 2017, Plaintiff's access card was suspended. That same day he received a Notice of Proposed Removal "for improper conduct, appearance of impropriety, and lack of candor." (Id. ¶ 122). That proposal (penned by Dr. Cooper) was sustained by Director Vedral-Baron in the form of a Removal Decision provided to Plaintiff on November 9, 2017. (Id. ¶ 123). Plaintiff's employment with the VA ended a little over a week later.

## D. Additional Facts and Explanations By Plaintiff

On November 5, 2015, Plaintiff initiated an informal complaint alleging discrimination based on national origin and reprisal. The complaint listed Dr. Cooper as the responsible party. (PSOF ¶¶ 3). Plaintiff believes Dr. Cooper responded to the complaint approximately 30 days later, but Dr. Cooper claims not to have become aware of protected activity until Plaintiff filed a formal EEO complaint on August 28, 2017. (Id. ¶ 4). Defendant does not dispute, however, that Plaintiff filed another administrative complaint on May 18, 2016, alleging that he was subjected to a hostile work environment based on discrimination (national origin) and reprisal (opposition to discrimination). (DSOF ¶ 7).

9

Plaintiff's alleged opposition to discrimination began in July or August 2013 when Dr. Cooper called Plaintiff into his office and requested that he terminate Monica Martin, an African American female employee. Plaintiff balked at the request because Ms. Martin had worked for him for twenty years and he believed her to be a good employee. Nevertheless, Dr. Cooper demanded that Plaintiff fire her. Plaintiff believed that Dr. Cooper wanted Ms. Martin terminated, in part, because of her race and that this was discriminatory. (PSOF ¶¶ 7, 8).

Next, while Plaintiff was out-of-the-country on approved leave in January and February 2015, Dr. Cooper selected an interview board to consider applications for the position of Lead Sleep Technician. The board chose a Caucasian male, even though there were two African Americans who were qualified for the position. When Plaintiff returned from his trip, he asked Dr. Cooper why the two other qualified candidates were not considered but Dr. Cooper could only give a "vague answer which did not make any sense." (Id. ¶ 18).

Plaintiff also claims that many of the allegations against him by Dr. Cooper were trumped-up or outright untrue. For example, Plaintiff was accused by Dr. Cooper of being "habitually late" for clinic on Friday but, on many of those occasions, Plaintiff was the only neurologist working in the hospital, and had to cover the emergency room, the ICU, and sometimes patients in psychiatric emergency. Moreover, he was still reachable by pager or phone. (Id. ¶ 22).

Plaintiff further asserts that when he was suspended on October 23, 2015, Dr. Cooper told him he was being relieved of his supervisory duties at the request of the Department of Justice due to the ongoing investigation surrounding potential violations of the Hatch Act relating to Plaintiff's 2014 Senate run. Plaintiff says he contacted the DOJ and was informed that simply was not true. (Id. ¶ 29). He provides no evidence of that contact nor name the individual to whom he had

10

allegedly spoken.

Plaintiff also insists that Dr. Cooper was untruthful in a letter dated July 11, 2016 when he accused him of using the VA facility in Murfreesboro to see non-VA patients, and using VA equipment and time to support his outside medical-consulting practice. As a result, Plaintiff was barred from his office for 3 months while the VA conducted its investigation and searched his office to see if there was evidence of outside work. During that period, Plaintiff had to share an office with a subordinate Sleep Technician. This was not only humiliating and embarrassing to Plaintiff, it hindered him from teaching his medical students and residents. (Id. ¶¶ 29-31). Dr. Cooper conceded in his deposition that "it is not improper for a VA doctor to do work for patients involving non-VA patients on non-VA time." (Id. ¶ 52). Nor, subject to the guidelines for release of medical records, is it improper "for a VA doctor who examines a VA patient to provide relevant information to an outside attorney for legal proceedings." ((Id. ¶55). Furthermore, Dr. Copper has no evidence himself showing that VA records were used to facilitate Plaintiff's private business.

In Plaintiff's view, the reprisals continued when his medical privileges were suspended by Director Vedral-Baron based on complaints from female veterans about his supposedly inappropriate and unprofessional conduct. As he explained then, and does now, a Sleep Specialist asking a female patient about whether she is married or whether she has a boyfriend is hardly untoward because a patient's sleep habits and partners are important to know. Dr. Cooper concedes questions about bed partners could be relevant to a Sleep Specialist. (Id. ¶¶ 36-38, 60).

Finally, on the issue of Plaintiff's supposed lack of candor, the OIG suggested that he falsely stated under oath that he was working at the hospital on September 21, 2016, when he was not. However, according to Plaintiff, it was never conclusively determined whether he was "AWOL"

11

from the hospital on that date. (Id. ¶¶ 56, 57).

**E. Complaint History**

In addition to the informal complaint filed on November 5, 2015 mentioned previously, Plaintiff filed a formal administrative complaint against the Defendant on May 18, 2016, claiming he was subjected to a hostile work environment based on discrimination (national origin) and reprisal (for opposing discriminatory conduct). On August 28, 2017, Plaintiff filed another administrative complaint, claiming he was subjected to a hostile work environment based on race, national origin, and reprisal. (DSOF ¶¶ 7-9). The administrative complaint was amended on October 23, 2017 and November 15, 2017 to add additional allegations of reprisal and discrimination by the VA. (PSOF ¶ 45). The Complaint in this Court was filed on February 9, 2021.

## II. Legal Discussion

**A. National Origin/Race Discrimination**

Discrimination claims can be proved through either direct evidence or indirect evidence. Direct evidence is evidence that proves intentional discrimination without making any inference, such as "[a]ny discriminatory statements . . . from decisionmakers[.]" Flones v. Beaumont Health System, 567 F. App'x 399, 404 (6th Cir. 2014). Plaintiff points to absolutely no direct evidence and certainly nothing that showed the actions Dr. Cooper or Defendant took were because of Plaintiff's national origin or race.

That leaves the indirect method of showing discrimination, first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and subsequently refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this burden-shifting framework, a plaintiff must "first make out a prima facie case" of discrimination. Rogers v. Henry

12

Ford Health Sys., 897 F.3d 763, 772 (6th Cir. 2018). The burden then "shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision." Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009). If the employer does so, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." Id.

To establish a prima facie case of national origin or race discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the position or was performing it satisfactorily; and (4) he was treated differently from a similarly situated person outside the protected class. Vickers v. Fairfield Medical Center, 453 F.3d 757, 762 (6th Cir. 2006). Except for the first prong on which there can be no dispute, Plaintiff's proof on the next two is somewhat ambiguous and his case definitely fails on the last prong.

Plaintiff asserts that he was subjected to a myriad of adverse employment actions such as being relegated to a smaller office for a period, being scrutinized by Dr. Cooper, and not receiving performance pay that he believes he was entitled to. However, courts have typically limited adverse employment actions to instances relating to "discharge, demotions, . . . and failure to promote." Sensabaugh v. Halliburton, 937 F.3d 621, 628 (6th Cir. 2019). Receiving lesser pay can also be an adverse employment action. See, Erwin v. Honda N. Am., Inc., No. 22-3823, 2023 WL 3035355, at *3 (6th Cir. Apr. 21, 2023); Szeinbach v. Ohio State Univ., 493 F. App'x 690, 694 (6th Cir. 2012). On the other hand, "increased surveillance and discipline, whether warranted or not, do not constitute a material adverse change in the terms of employment in the discrimination context." Lee v. Cleveland Clinic Found., 676 F. App'x 488, 494 (6th Cir. 2017) (citing White v. Baxter Healthcare

13

Corp., 533 F.3d 381, 402 (6th Cir. 2008)).

Plaintiff repeatedly harps on his belief that he should have been paid more but has not shown through any admissible evidence that Sleep Specialist were a recognized specialty within the VA, nor has he explained how his performance was such that he should have received more pay, either in salary or performance pay. Regardless, he was terminated and for this reason the Court finds he has met the second prong for purposes of summary judgment.

The third prong presents a closer question. Plaintiff was a neurologist and qualified as a Sleep Specialist, but there were documented problems with his performance for several years, with a recent review showing the vast majority of his charts were incorrect. However, because the proof needed to establish a *prima facie* case is not onerous but one easily met, Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 776 (6th Cir. 2016), and because Plaintiff was rated "minimally qualified" at his last three performance reviews, the Court finds this prong has also been met.

Plaintiff's national origin/race claim falls apart at the fourth prong because he cannot identify a similarly situated employee outside the protected class who was treated differently. Generally, "[t]o constitute similarly situated employees, the individuals with whom [Plaintiff] seeks to compare h[is] treatment 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.'" Goldblum v. Univ. of Cincinnati, 62 F.4th 244, 255 (6th Cir. 2023) (quoting Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 364 (6th Cir. 2010)). Nevertheless, the anti-discrimination laws "are not served by an overly narrow application of the similarly situated standard," Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 396 (6th Cir. 2008), and, thus, requiring an employee "'to demonstrate that he or she was

14

similarly-situated in every aspect to an employee outside the protected class receiving more favorable treatment removes from the protective reach of the anti-discrimination laws employees occupying unique positions, save in those rare cases where the plaintiff produces direct evidence of discrimination.'" Id. (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)). In such cases, a plaintiff need not show similarity in all respects, but rather similarity in the relevant respects.

Plaintiff suggests he was in a "unique position" because he was the only Sleep Specialist employed by the VA in Murfreesboro. He ignores, however, that he is a neurologist and there is presumably other neurologists supervised by Dr. Cooper. (Doc. No. 78-1 at 5 and 9, Plaintiff's declaration referencing other VA neurologists.) He makes no effort to compare his treatment with those physicians. Instead, during his deposition, Plaintiff suggested that appropriate comparators could be found in other Sleep Specialist employed in the VISN-9 region, including one in Memphis, Tennessee and another in Louisville, Kentucky. He does not name either of those two individuals, let alone make any effort to show that they are similar in some relevant respect or even outside the protected class, as was his burden. See Ercegovich, 154 F.3d at 352; Dickens v. Interstate Brands Corp., 384 F. App'x 465, 466 (6th Cir. 2010) (finding that where plaintiff "has provided no evidence that those employees he seeks to compare himself with were similarly situated to him," he "has not met his prima facie burden" and summary judgment is appropriate).

Defendants are entitled to summary judgment on Plaintiff's national origin/race claim.

## B. Retaliatory Harassment/Retaliation

Claim of retaliatory harassment and retaliation are also subject to the McDonnell-Douglas burden-shifting paradigm. Here, Plaintiff's claim fails at the pretext stage of the inquiry.

15

To establish a prima facie case of retaliation or retaliatory harassment, plaintiff must show that (1) he engaged in activity protected by Title VII; (2) his exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523 (6th Cir. 2008) (retaliation) Morris v. Oldham Cnty. Fiscal Ct., 201 F.3d 784, 792–93 (6th Cir. 2000) (retaliatory harassment). In the retaliation context, however, "the term 'adverse employment action' encompasses more than just actions that affect 'the terms, conditions or status of employment.'" Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 419–20 (6th Cir. 2021) (quoting Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 345 (6th Cir. 2008)). "It includes any conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)).

Here, it is clear that Plaintiff filed at least two separate formal complaints (one of which was amended) and Defendant admits as much. Further, he suffered an adverse employment action not only when he was terminated, but arguably also when he was forced to work in a subordinate's office and escorted to retrieve his personal belongings, as both could have dissuaded his co-workers from complaining. And, he has met the fourth prong because only two months elapsed between his last EEO complaint and his termination. Dye v. Off. of the Racing Comm'n, 702 F.3d 286, 306 (6th Cir. 2012) ("A lapse of two months, as is the case here, is sufficient to show a causal connection, and the district court erred in holding otherwise."); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (holding that three months between protected activity and adverse action "is

significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [plaintiff's] burden of demonstrating a *prima facie* case").

With plaintiff having carried the "minimal burden" of establishing a *prima facie* case, E.E.O.C. v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997), the burden of production shifts to Defendant to show a legitimate, non-discriminatory reason for its action. Plaintiff concedes "in this case the Defendant has done [so], *i.e.*, the Notice of Proposed Removal from Dr. Cooper [that] lists a number of infractions to support the VA's decisions to terminate Dr. Salekin." (Doc. No. 81 at 20). Plaintiff submits, however, that "[t]his is the summary judgment stage [and] Dr. Salekin has adamantly and consistently denied the allegations contained in the Notice of Proposed Removal and Removal Decision, and his denials of the allegations carry some weight." (Id.). Elsewhere he writes:

> If [the Notice of Proposed Removal and Removal Decision] was the entire story, Defendant would probably be correct that summary judgment should be granted. However, Dr. Salekin has denied the accusations leveled against him by Dr. Cooper and Ms. Vedral-Baron in the November 2017 removal documents, so that at this stage, there are genuine issues of material facts sufficient to defeat summary judgment as to who is correct. In other words, it's a jury question as to whether the reasons outlined by the VA in the Removal Decision have a legitimate 'basis in fact,' or are made up.

(Id. at 14-15).

To present a jury question, Plaintiff must present some *evidence* from which a jury could conclude that the stated reasons for his termination were a pretext for retaliation. He may do so by showing that Defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir. 2003) (quoting Dews v. A.B. Dick Co.,

231 F.3d 1016, 1021 (6th Cir.2000)). In the context of a retaliation claim, this means that, to survive summary judgment, Plaintiff must produce sufficient *evidence* from which a reasonable jury could determine that but-for his filing EEOC claims, he would not have been terminated. See Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m)). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

It is here where the requirements of Rule 56 and the use of conclusory affidavits comes sharply into focus. The Removal Decision from Director Vedral-Baron (which closely tracks the Proposed Notice from Dr. Cooper) identifies three broad grounds for dismissal: (1) Improper Conduct; (2) Appearance of Impropriety; and (3) Lack of Candor. (Doc No. 68-3). For each category, specific examples are given – eight in total. These include Plaintiff: (1) sending an impertinent email on June 28, 2017 to Director Vedral-Baron; (2) improperly communicating with a Nurse Practitioner on July 16, 2017 through a patient's record; (3) telling the OIG Agent that he had not referred VA patients to an attorney; (4) leaving paperwork in his office on October 20, 2016 showing he had received payment from an attorney for a record about a VA patient; (5) preparing an independent medical exam for an attorney using the same patient information stored on the VA Computerized Record System that Plaintiff had entered when he evaluated the patient three months earlier; and (6 - 8) telling the Agent that he had been in the hospital working on September 21, 2015 and thereafter trying to convince the Agent he was at the hospital by providing a sleep study that was actually done on the following day.

Plaintiff has not provided competent *evidence* from which a jury could conclude that the

assorted reasons for his dismissal were untrue, were not the real reason, or were insufficient to support Defendant's decision. In the last two paragraphs of his Declaration, Plaintiff states:

51. On or about October 23, 2017, I received a document entitled "Notice of Proposed Removal" from Dr. Michael Cooper. (*See* **Exhibit C**) In the document from Dr. Cooper, he outlines a total of eight (8) separate items used by the TVHS to recommend my termination from the VA. I have studied and reviewed the document. I did not engage in the conduct that I have been accused of in the October 23, 2017 letter from Dr. Cooper.

52. On or about November 13, 2017, I received from Ms. Vedral-Baron a document entitled "Removal Decision." (*See* **Exhibit D**) In that document, which essentially tracked and was identical to the letter from Dr. Cooper dated October 23, 2017, I was informed that I was being terminated from the TVHS for the alleged conduct. Again, I did not engage in the conduct that I was accused of as stated in the document.

(Doc. No. 78-1, Salekin Dec. ¶¶ 51-52).

Obviously, these whole-scale, blanket denials are conclusory and insufficient to create a genuine issue of material fact as to whether Defendant's stated reasons were pretextual. They are even less so considering that Plaintiff attempts to explain away a few of them. This shows that the events did occur, but Plaintiff has an explanation for them.

Take, for instances, the email to Vedral-Baron that is listed as the first ground. Plaintiff does not deny sending the email, he only argues against the interpretation placed upon it and, even then, only part of it. In the email, Plaintiff referenced Defendant's decision to fire him as being "[l]ike adding a drop of urine in a bucket of pure milk, which spoils the entire milk in the bucket. Your

19

decision has wrongfully projected me as a sex predator[.]" (Doc. No. 78-3). Plaintiff believes that Vedral-Baron misinterpreted his urine-in-milk "metaphor" to being what impact his termination would have on the VA as a whole when Plaintiff was merely trying to make the point that his being deemed a "sex predator" would tarnish his own reputation. Maybe that was the intent, but it is clear that the email was sent and hence his conclusory statement that he did not engage in the conduct is false. Moreover, and leaving aside that the reference to being a "sex predator" is Plaintiff's spin, the email went further, with Plaintiff asking that he be provided the complaining patient's name so that he could request an independent psychiatric examination of her. He also suggested that the patient likely had a "narcissistic personality disorder" and may have had an "emotional fantasy" about him. (Id.). This tends to support the VA's stated position that it was concerned for the patients under its care.

Consider also the allegations that a check was found in his office from an attorney, for an independent medical examination prepared for that attorney. It may well be that VA doctors are allowed to have an outside medical practice or allowed to offer their services as a consultant as Plaintiff claims, but Plaintiff has not provided any evidence that those documents were not found in is office, let alone that he could use VA medical records he developed at work as a part of his outside practice.

Beyond that, Plaintiff rehashes his supposed retaliatory treatment over the years, with his contention that he received lesser pay particularly sticking in his craw. However, Plaintiff produced not a bit of evidence that he was improperly paid less, only his unadorned accusations support the allegation. "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." Alexander v. CareSource, 576 F.3d 551, 560

20

(6th Cir. 2009); <u>Lewis v. Philip Morris Inc.</u>, 355 F.3d 515, 533 (6th Cir.2004) (same).

Furthermore, many of Plaintiff's complaints are untimely. Nevertheless, he "relies on the 'continuing violation' doctrine, at least as it relates to his complaints of unfair treatment by Dr. Cooper in 2014 as to unequal pay and retaliation for opposing the termination of a Monica Morris, a black female employee in the Sleep Department." (Doc. No. 81 at 13) As support, he relies on out-of-circuit authority stating that "'under the continuing violations doctrine, acts that fall outside the statutory period may be actionable.'" (<u>Id.</u>) (quoting <u>Scott v. Gino Morena Enters., LLC</u>, 888 F.3d 1101, 1112 (9th Cir. 2018)). The key word is "may."

In <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, the Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." 536 U.S. 101, 105 (2002). The Court also "h[e]ld that consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." <u>Id.</u> In other words, <u>Morgan</u> "held that when an employee seeks redress for discrete acts of discrimination or retaliation, the continuing violation doctrine may not be invoked to allow recovery for acts that occurred outside the filing period." <u>Sharpe v. Cureton</u>, 319 F.3d 259, 267 (6th Cir.2003).

Here, Plaintiff filed his initial EEO charge on November 5, 2015 and, as a federal employee, he had to contact an EEO counselor within 45 days of the supposedly discriminatory act. 29 U.S.C. § 1614.105(a)(1). The allegedly "unfair treatment by Dr. Cooper in 2014 as to unequal pay and retaliation for opposing the termination of a Monica Morris, a black female employee in the Sleep Department" are discrete acts and were not within 45 days of his first contacting an EEO counselor.

21

This leaves the less than two month period between Plaintiff filing his charge and the termination decision. Although "temporal proximity can be used as 'indirect evidence' to support an employee's claim of pretext," Asmo v. Keane, Inc., 471 F.3d 588, 598 (6th Cir. 2006), "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext," Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 285 (6th Cir. 2012). Besides, both the AFF investigation and the OIG's independent investigation that led to Plaintiff's termination were well underway when Plaintiff filed his formal charge on August 28, 2017.

No doubt Plaintifff disagrees with the temerity of the VA calling his actions into question, paying him what it did, and firing him. "But for legal purposes, that disagreement is insufficient to show pretext." Papierz v. Benteler Auto. Corp., No. 21-1237, 2022 WL 154342, at *2 (6th Cir. Jan. 18, 2022) (citing Cline v. BWXT Y-12, LLC, 521 F.3d 507, 510 (6th Cir. 2008); Browning v. Dep't of Army, 436 F.3d 692, 697 (6th Cir. 2006)). At the pretext stage, "[t]he burden of producing evidence of 'pretext' essentially merges with the burden of persuasion, which always lies with the plaintiff," Gragg v. Somerset Technical Coll., 373 F.3d 763, 768 (6th Cir.2004), and "[t]his requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 133 S.Ct. at 2533. Plaintiff has presented no such proof as required by Rule 56 and, therefore, summary judgment will be granted on his retaliation/retaliatory harassment claim.

## C. **Harassment/Hostile Work Environment Claim**

Summary judgment will also be granted on Plaintiff's harassment/hostile work environment claim. To establish this claim, Plaintiff was required to show (1) he was a member of a protected class; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on his

protected status; (4) the harassment created a hostile work environment; and (5) employer liability. Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 411 (6th Cir. 2021). "Harassment creates a hostile work environment '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id. (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986)). In determining whether the workplace was hostile, a court considers "all the circumstances," Harris, 510 U.S. at 23, from the perspective of "a reasonable person in the plaintiff's position," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Factors to be consider include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

Plaintiff has not even come close to showing that he was subjected to a hostile work environment, whether it be based upon his national origin or his protected activity.

Even drawing all reasonable inferences in his favor, the most he has shown is internecine squabbles, mostly with Dr. Cooper. He complains about his performance evaluations, a counseling letter, a reprimand, and his suspension. Even viewed under the totality of the circumstance, Plaintiff's allegations are not of the quality or quantity to support a hostile work environment claim, and no reasonable jury could conclude that Plaintiff's work-environment was objectively hostile. See Oncale, 523 U.S. at 80 ("The anti-harassment laws do not serve as "a general civility code for the American workplace[.]"); Burlington Northern, 548 U.S. at 58 (stating that "petty slights or minor annoyances that often take place at work and that all employees experience" are insufficient to

23

establish a hostile work environment claim).  While Plaintiff may not have liked many of Defendant's decisions, he has not shown that he was forced to work in a hostile environment.

### III.  Conclusion

On the basis of the foregoing, Defendant's Motion for Summary Judgment will be granted and Plaintiff's claims will be dismissed.  Defendant's Motion to Strike (Doc. No. 82) will be denied as moot.

An appropriate Order will enter.


_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE